DENNIS JACOBS, Chief Judge:
Jonathan Gonzalez brought suit against the City and County of Schenectady and three Schenectady police officers under 42 U.S.C. § 1983 and state law alleging arrest without probable cause and conduct of a visual body cavity search in violation of the Fourth Amendment. In an area known for drug activity, Gonzalez told a confidential informant (who was wearing a wire), “What do you need? I can get you whatever you need.” Gonzalez was arrested, taken to the police station, and subjected to a visual body cavity search. Gonzalez was required to take off his clothes and stand against a wall, where he spread his legs and spread his buttocks. Officers saw a protruding plastic bag, which contained crack cocaine.
Gonzalez was charged with criminal possession of a controlled substance and, after losing his suppression motion, was convicted by a jury and sentenced to two-and-a-half years’ imprisonment followed by two years’ post-release supervision. The New York Supreme Court, Appellate Division, Third Department, reversed the conviction on the ground that the visual body cavity search was unlawful, relying on a New York Court of Appeals case, People v. Hall, that was decided after the search took place.
Gonzalez brought suit in the Northern District of New York, under 42 U.S.C. *153 § 1983, alleging false arrest and unlawful search, and naming the City, the County, and the three officers involved with the search. The district court granted summary judgment in favor of defendants on the ground of qualified immunity. Gonzalez appeals, and for the following reasons, we affirm.
BACKGROUND
On May 16, 2006, the Schenectady Police Department was conducting a buy-and-bust operation using a confidential informant who was wearing a wire. The confidential informant drove to a parking lot in an area of Schenectady known as a drug mart. With him were a woman and her boyfriend Matt. The pair got out of the car while the confidential information stayed inside.
In a conversation heard by police via the wire, Gonzalez approached Matt and asked, “What’s up?” Matt said he was “trying to get something.” Gonzalez responded: “What do you need? I can get you whatever you need.” Because the buy and bust was targeting a different dealer, the woman said, “We are all set,” and Gonzalez walked away.
Officers John Maloney and Sean Daley, defendants here, had observed the encounter but did not hear the conversation. Detective Christopher Cowell, who had listened in, radioed to tell them that Gonzalez had just attempted to sell drugs. Gonzalez then walked to the bus station to buy a ticket to the Bronx to visit his mother. At the bus station, two other officers — Robert Dashnow and defendant Eric Peters — approached Gonzalez with guns drawn, told him to get on the ground outside the station, and searched him. After finding nothing, they placed him in a van, and Officer Daley began to question him and search him again.
At the police station, Officers Peters and Maloney elicited Gonzalez’s background information, and then told him to take his clothes off. When Gonzalez was undressed, Officer Maloney instructed him to stand against the wall, spread his legs, and spread his buttocks so they could.see inside. The officers observed a “little plastic bag sticking out ... of [his] rectum.” Gonzalez alleges that one of the officers then “put his fingers in [Gonzalez’s] rectum penetrating [his] rectum” and removed a bag containing drugs. He claims that this (as opposed to the storage) caused him to bleed for approximately a year afterwards. Defendants assert that Gonzalez pulled it out himself.
Gonzalez was charged with criminal possession of, a controlled substance. The trial court denied his motion to suppress the drugs found in the search, focusing almost. exclusively on whether there was probable cause to arrest Gonzalez, and concluding that there was. The court made only a passing remark about the legality of the search itself: “Subsequent to [Gonzalez’s] arrest, a lawfully conducted strip search did in fact reveal that [he] possessed cocaine.”
A jury convicted Gonzalez of Criminal Possession of a Controlled Substance in the Third Degree and Criminal Possession of a Controlled Substance in the Fourth Degree, and he was sentenced to two-and-a-half years’ imprisonment and two years’ post-release supervision.
On December 24, 2008, the New York Supreme Court, Appellate Division, Third Department, reversed the conviction, concluding that “there was no specific, articulable factual basis supporting a reasonable suspicion for conducting the visual cavity inspection here. [A]nd the evidénce related to the inspection should have been suppressed.” People v. Gonzalez, 57 A.D.3d 1220, 1222, 870 N.Y.S.2d 529 (3d Dep’t *154 2008). The Third Department cited People v. Hall, 10 N.Y.3d 303, 856 N.Y.S.2d 540, 886 N.E.2d 162 (2008), in support of its conclusion that the police needed reasonable suspicion that they would find contraband in Gonzalez’s body cavity.
Gonzalez filed a summons in New York Supreme Court on July 27, 2009, against the City of Schenectady, the County of Schenectady, and Officers Maloney, Daley, and Peters under 42 U.S.C. § 1983, arguing that the arrest and visual body cavity search violated Gonzalez’s Fourth Amendment right to be free from unreasonable searches and seizures.[1] Defendants removed the case to the Northern District of New York (Hurd, /.). The district court dismissed the case on summary judgment in November 2011, concluding that the officers wete entitled to qualified immunity for the arrest because there was “arguable probable cause.” It also concluded that they were entitled to qualified immunity for the search because the law on body cavity searches was not clearly established when the search occurred, Hall having been decided (in 2008) two years after the search. The claims against the City and County were dismissed because Gonzalez alleged only vicarious liability.[2]
DISCUSSION
The Court reviews de novo a decision on a motion for summary judgment. Mario v. P & C Food Mkts., Inc., 313 F.3d 758, 763 (2d Cir.2002); see also Miller v. Wolpoff & Ábramson, L.L.P., 321 F.3d 292, 300 (2d Cir.2003). Summary judgment is appropriate if there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Miller, 321 F.3d at 300. In assessing a motion for summary judgment, a Court is “required to -resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment [was granted].” Terry v. Ashcroft, 336 F.3d 128, 137 (2d Cir.2003) (internal quotation marks omitted).
I
The doctrine of qualified immunity protects government officials from suit if “their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.” Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). The issues on qualified immunity are: (1) whether plaintiff has shown facts making out violation of a constitutional right; (2) if so, whether that right was “clearly established”; and (3) even if the right was “clearly established,” whether it was “objectively reasonable” for the officer to believe the conduct at issue was lawful. Taravella v. Town of Wolcott, 599 F.3d 129, 133-34 (2d Cir.2010).
To be clearly established, “[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.” Anderson v. Creighton, 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). In this way, qualified immunity shields official conduct that is “ ‘objectively legally reasonable in light of the legal rules that were clearly established at the time it was taken.’ ” X-Men Sec., Inc. *155 v. Patctki, 196 F.3d 56, 66 (2d Cir.1999) (alterations omitted) (quoting Anderson, 483 U.S. at 639, 107 S.Ct. 3034); see also Taravella, 599 F.3d at 134-35.
II
A § 1983 claim for false arrest is substantially the same as a claim for false arrest under New York law. Weyant v. Okst, 101 F.3d 845, 852 (2d Cir.1996). “The existence of probable cause to arrest constitutes justification and is a complete defense to an action for false arrest, whether that action is brought under state law or under § 1983.” Id. (internal quotation marks omitted); see also Broughton v. State, 37 N.Y.2d 451, 456-58, 373 N.Y.S.2d 87, 335 N.E.2d 310 (1975).
A
The first question as to qualified immunity is whether the officers violated Gonzalez’s rights by arresting him. That is, whether the officers had probable cause to arrest him at the time of the arrest. “In general, probable cause to arrest exists when the officers have knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime.” Weyant, 101 F.3d at 852 (emphasis added). The inquiry is' limited to “whether the facts known by the arresting officer at the time of the arrest objectively provided probable cause to arrest.” Jaegly v. Couch, 439 F.3d 149, 153 (2d Cir.2006).
To ascertain the existence of probable cause, we look at the facts as the officers knew them in light of the specific elements of each crime. While an officer “need not have concrete proof of each element of a crime to establish probable cause for an arrest,” Brewton v. City of New York, 550 F.Supp.2d 355, 365 (E.D.N.Y.2008), probable cause means “more than bare suspicion,” Brinegar v. United States, 338 U.S. 160, 175, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949). . And it certainly means more than suspicion of some generalized misconduct: “no probable cause exists to arrest where a suspect’s actions are too ambiguous to raise more than a generalized suspicion of involvement in criminal activity.” United States v. Valentine, 539 F.3d 88, 94 (2d Cir.2008).
The only facts known to the officers at the time of the arrest were that (1) Gonzalez was in an area known for drug sales, and (2) Gonzalez approached Matt and offered to get him “whatever [he] need[ed].”[3] The question is whether these circumstances supported probable cause to arrest Gonzalez-for criminal possession of a controlled substance, or for criminal sale of a controlled substance, or for an attempt.
1
Gonzalez was convicted of Criminal Possession of a Controlled Substance in the Third and Fourth Degrees.. A person is guilty of Criminal Possession of a Controlled Substance in the Third Degree “when he knowingly and unlawfully possesses ... a narcotic drug with intent to sell it.” N.Y. Penal Law § 220.16(1). A person is guilty of Criminal Possession of a Controlled Substance in the Fourth Degree “when he knowingly and unlawfully possesses ... one or more preparations, *156 compounds, mixtures or substances ■ containing a narcotic drug ... [with] an aggregate weight of one-eighth ounce or more.” Id § 220.09(1)
The most natural meaning of Gonzalez’s statement (that he could get Matt “whatever [he] need[ed]”) is that Gonzalez possessed no controlled substance at the moment,- and that if Matt needed some, Gonzalez would have to “get” it. The statement did not preclude the possibility that Gonzalez was keeping drugs in a body cavity, since it would not be expected that he would retrieve it for delivery then and there; but neither did the statement indicate 'that he had on his person whatever drug Matt might name.
The officers never saw Gonzalez make a transaction, nor did they see anything Showing that Gonzalez possessed drugs, as opposed' to simply knowing where to get them. Cf. People v. Eldridge, 103 A.D.2d 470, 471-72, 480 N.Y.S.2d 481 (1st Dep’t 1984) (overturning finding of no probable cause where officers observed defendant with glassine envelopes containing a white substance in a high drug area). '
2
Even without probable cause to believe Gonzalez possessed drugs, the officers might have had probable cause to arrest Gonzalez for Criminal Sale of a Controlled Substance, which requires a defendant to have “knowingly and unlawfully [sold] ... a narcotic drug.” N.Y. Penal Law § 220.39. Under New York Penal Law § 220.00, “ ‘[s]ell’ means to sell, exchange, give or dispose of to another, or to offer or agree to do the same.” (Emphasis added). The New York Court of Appeals has held that, “in order to support a conviction under an offering for sale theory, there must be evidence of a bona fide offer to sell— ie., that defendant had both the intent and the ability to proceed with the sale.” People v. Mike, 92. N.Y.2d 996, 998, 684 N.Y.S.2d 165, 706 N.E.2d 1189 (1998); see also People v. Crampton, 45 A.D.3d 1180, 1181, 845 N.Y.S.2d 877 (3d Dep’t 2007).
The Mike case is instructive:
Defendant approached two off-duty police officers and inquired whether they were interested in purchasing an unspecified type and quantity of drugs. One of the officers asked if defendant had any “dime bags;” [sic] defendant responded that he only had “twenties.” Ultimately, defendant got into the officers’ vehicle and led them to the driveway of a building. Defendant told the officers to give him some money, and he would go into the building and get the drugs. The officer who had offered to purchase the drugs was unwilling to go along with this arrangement. The money belonged to the officer and he was admittedly afraid that defendant would simply abscond with it. Because of the officer’s unwillingness to either part with the money or accompany defendant into the building, the transaction proceeded no further and without ever having exited the vehicle, defendant was placed under arrest for offering to sell drugs.
Mike, 92 N.Y.2d at 998, 684 N.Y.S.2d 165, 706 N.E.2d 1189. The Court of Appeals held that the evidence in that case “was insufficient to establish that defendant had the ability to carry out the sale.” Id. at 999, 684 N.Y.S.2d 165, 706 N.E.2d 1189; see also People v. Braithwaite, 162 Misc.2d 613, 614-16, 617 N.Y.S.2d 284 (N.Y.Sup.Ct. 1994) (finding that the evidence was insufficient to support a conviction for Criminal Sale of a Controlled Substance because “[t]he offer here was anything but definite. It was couched in terms such as ‘if I can get’; ‘you want like an ounce or so’; ‘you willing to spend like $800’; ‘once I get the *157 price’; and ‘you know how long I don’t buy a ounce.’ ”).
Gonzalez did not “offer” to sell drugs to Matt because what Gonzalez said was considerably short of a “bona fide” offer. Cf. People v. Rodriguez, 184 A.D.2d 439, 439, 585 N.Y.S.2d 391 (1st Dep’t 1992) (concluding that an offer to sell cocaine, followed by an undercover, officer “asking for.‘two’ ” and the defendant reaching for a cigarette box containing the cocaine, was sufficient). Once Gonzalez walked away from : Matt, there was no reason to believe that he had made a bona fide offer.
There was therefore no probable causé to arrest Gonzalez for Criminal Sale of a Controlled Substance.
3
The officers might have also had probable cause to arrest Gonzalez for attempting either one of these two crimes. “A person is guilty of an attempt to commit a crime when, with intent to commit a crime, he engages in conduct which tends to effect the commission of such crime.” N.Y. Penal Law § 110.00. For an. attempt, it must be shown that the defendant “committed an act or acts that carried the project forward within dangerous proximity to the criminal end to be attained.” People v. Warren, 66 N.Y.2d 831, 832-33, 498 N.Y.S.2d 353, 489 N.E.2d 240 (1985) (citing People v. Di Stefano, 38 N.Y.2d 640, 652, 382 N.Y.S.2d 5, 345 N.E.2d 548 (1976)). A defendant cannot be convicted for Attempted Criminal Sale of -a Controlled Substance if “several contingencies [stand] between the agreement ... and the contemplated purchase.” Warren, 66 N.Y.2d at 833, 498 N.Y.S.2d 353, 489 N.E.2d 240. The court arrived at that result in Warren notwithstanding that the defendant had met with an undercover officer and discussed the quality, quantity, and price of the cocaine purchase that was to take place later. Id. at 832, 498 N.Y.S.2d 353, 489 N.E.2d 240.
As in Warren, “several contingencies [stand] between” Gonzalez’s off-the-cuff statement and a sale of drugs. The officers therefore lacked probable cause to believe that Gonzalez had attempted to commit either crime.
B
The right to be free from arrest without probable cause was clearly established at the time of Gonzalez’s arrest. See Jenkins v. City of New York, 478 F.3d 76, 86-87 (2d Cir.2007). Gonzalez’s false arrest claim therefore turns on whether the officers’ probable cause determination was objectively reasonable. See id. “An officer’s determination is objectively reasonable if there was ‘arguable’ probable cause at the time of the arrest— that is, if ‘officers of reasonable competence could disagree on whether the probable cause test was met.’” Id. (quoting Lennon v. Miller, 66 F.3d 416, 423-24 (2d Cir.1995)). However, “ ‘[arguable’ probable cause should not be misunderstood to mean ‘almost’ probable cause.... If officers of reasonable competence would have to agree that the information possessed by the officer at the time of arrest did not add up to probable cause, the fact that it came close does not immunize the officer.” Id.
The analysis of probable cause set out above entails a careful parsing of Gonzalez’s statement and a close examination of the elements of a number of different criminal statutes. Officers charged with making moment-by-moment decisions cannot be expected to undertake such a project. While Gonzalez’s statement on its own does not satisfy the elements of any crime, he was in an area known for drug sales and he said it to a person obviously trawling for drugs. (The.police could in *158 tuit that Matt and Gonzalez were not talking about prostitutes, absinthe, or Cuban cigars.) Significantly, the experienced state trial judge conscientiously analyzed the probable cause question during the criminal proceeding and concluded that there was indeed probable cause to arrest Gonzalez.
We therefore conclude that there was “arguable” probable cause and that the officers are entitled to qualified immunity for Gonzalez’s false arrest claim under § 1983.[4]
Ill
The search of Gonzalez at the station raises a question as to Gonzalez’s Fourth Amendment right to be free from unreasonable searches. It is useful to define terms before proceeding to analysis: (1) a “strip search” occurs when a suspect is required to remove his clothes; (2) a “visual body cavity search” is one in which the police observe the suspect’s body cavities without touching them (as by having the suspect to bend over, or squat and cough, while naked); (3) a' “manual body cavity search” occurs when the police put anything into a suspect’s body cavity, or take anything out. See People v. Hall, 10 N.Y.3d 303, 306-07, 856 N.Y.S.2d 540, 886 N.E.2d 162 (2008).
A
The law governing these types of searches is far from settled; the rules alter with circumstances, and the circumstances are myriad. The key precedents turn kaleidoscopically on whether the arrest is for a felony or a misdemeanor, and whether the suspect is placed in the general prison population, among other considerations.
In Schmerber v. California, 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966), the suspect was hospitalized following a car accident. Id. at 758, 86 S.Ct. 1826. A policeman at the scene smelled alcohol on the suspect’s breath, and inferred from that and other observations that the suspect was drunk. Id. at 768-69, 86 S.Ct. 1826. At the hospital, the officer made the arrest and instructed a doctor to take a blood sample. Id. at 758, 86 S.Ct. 1826. The Supreme Court first held that there was probable cause for arrest and for a search incident to arrest. Id. at. 769, 86 S.Ct. 1826. However, the Court held that the search-incident-to-arrest doctrine alone did not justify the drawing of the suspect’s blood; the police needed “a clear indication that in fact such evidence will be found.” Id. at 669-70, 86 S.Ct. 1826. No warrant was required, though, because of the exigent circumstance that the blood-alcohol concentration would soon dissipate. Id.
In Bell v. Wolfish, 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979), the Supreme Court was asked to decide whether a blanket policy requiring visual body cavity searches for all pretrial detainees being housed in a correctional facility who had seen visitors was constitutional. Citing Schmerber, the Court held that the constitutionality of this scheme depended on “[1] the scope of the particular intrusion, [2] the manner in which it is conducted, [3] the justification for initiating it, and [4] the place in which it is conducted.” Id. at 559, 99 S.Ct. 1861. The Court concluded that the scheme was reasonable because “[a] *159 detention facility is a unique place fraught with serious security dangers.” Id.
In 1986, we held in Weber v. Dell that the Fourth Amendment precludes prison officials from performing strip/ body cavity searches of arrestees charged with misdemeanors or other minor offenses unless the officials have a reasonable suspicion that the arrestee is concealing weapons or other contraband based on the crime charged, the particular characteristics of the arrestee, and/or the circumstances of the arrest.
804 F.2d 796, 802 (2d Cir.1986) (emphases added). In Weber, the suspect was placed in a vacant cell, decreasing the concerns regarding jailhouse safety. Id. at 799.
This rule was later applied in Shain v. Ellison, 273 F.3d 56 (2d Cir.2001). The plaintiff had been arrested for first degree harassment, a misdemeanor. Id. at 60. Relying on Weber, we held that “it was clearly established in 1995 that persons charged with a misdemeanor and remand,ed to a local correctional facility ... have a right to be free of a strip search absent reasonable suspicion that they are carrying contraband or weapons.” Id. at 66.
Prior to the search at issue here, Judge McMahon of the Southern District of New York had decided a number of cases that expanded Weber to arrests for drug-related felonies. In Samicola v. County of Westchester, Judge McMahon held that “particularized reasonable suspicion” was required to strip search all suspects, whether they were arrested for misdemeanors or felonies. 229 F.Supp.2d 259, 270 (S.D.N.Y.2002). She observed that “[a]n automatic justification for strip searches based on an arrest for a drug-related crime would be inconsistent with the legal concept of reasonable suspicion based on the totality of the circumstances.” Id. at 273-74. She ruled to the same effect in Bradley v. Village of Greenwood Lake, 376 F.Supp.2d 528 (S.D.N.Y. 2005); Bolden v. Village of Monticello, 344 F.SupP.2d 407 (S.D.N.Y.2004); and Murcia v. County of Orange, 226 F.Supp.2d 489 (S.D.N.Y.2002). In so holding, Judge McMahon noted that “the Second Circuit has not spoken directly to the appropriate test for the. validity of a strip search incident to a felony arrest.” Samicola, 229 F.Supp.2d at 270; accord Murcia, 226 F.Supp.2d at 494.
In 2008, the New York Court of Appeals decided People v. Hall, 10 N.Y.3d 303, 856 N.Y.S.2d 540; 886 N.E.2d 162 (2008). In Hall, police observed Hall on a street corner repeatedly receive money from someone, go into a nearby bodega, and return a few minutes later with drugs to hand to the customer. Id. at 305-06, 856 N.Y.S.2d 540, 886 N.E.2d 162. The officers arrested him and strip-searched him at the station prior to placing him with any other prisoners. Id. When the officers told him to bend over, they saw a string coming out of his rectum. Id. Wben Hall refused to remove it, the officers removed it themselves and found that it was attached to a bag of crack cocaine. Id.
The Hall court began by defining the terminology outlined at the beginning of this Section. It then held as follows:
Summarizing the relevant constitutional precedent, it is clear that a [1] strip search must be founded on a reasonable suspicion that the arrestee is concealing evidence underneath clothing and the search must be conducted in a reasonable manner. To advance to the next level required for a [2] visual cavity inspection, the police must have a specific, articulable factual basis supporting a reasonable suspicion to believe the ar-restee secreted evidence inside a body cavity and the visual inspection must be conducted reasonably. If an object is visually detected or other .information *160 provides probable cause that an object is hidden inside the arrestee’s body, [3] Schmerber dictates that a warrant be obtained before conducting a body cavity search unless an emergency situation exists. Under our decision in More, the removal of an object protruding from a body cavity, regardless of whether any insertion into the body cavity is necessary, is subject to the Schmerber rule and cannot be accomplished without a warrant unless exigent circumstances reasonably prevent the police from seeking prior judicial authorization.
Id. at 310-11, 856 N.Y.S.2d 540, 886 N.E.2d 162. The court went on to say, “Our precedent on this point is unequivocal: the police are required to have ‘specific and articulable facts which, along with any logical deductions, reasonably prompted th[e] intrusion.’ ” Id. at 311, 856 N.Y.S.2d 540, 886 N.E.2d 162 (alteration in original) (quoting People v. Cantor, 36 N.Y.2d 106, 113, 365 N.Y.S.2d 509, 324 N.E.2d 872 (1975)). However, no case cited by the Hall court said that an officer needs particular, individualized facts to conduct a visual body cavity search.
In Florence v. Board of Chosen Freeholders of County of Burlington, — U.S. -, 132 S.Ct. 1510, 182 L.Ed.2d 566 (2012), the Supreme Court again confronted the issue of general prison strip search policies. In Florence, a mistake in a computer system led police to believe that there was an outstanding warrant for the plaintiffs arrest. Id. at 1514. He was pulled over and arrested pursuant to that warrant. Id. In jail, officials performed a visual body cavity search under a blanket policy. Id. The Supreme Court, building on Bell v.. Wolfish, held that a blanket policy of conducting visual body cavity searches on new inmates was constitutional, even for misdemeanor arrestees where there is no reason to suspect that the arrestee would have contraband. Id. at 1520-21.
The plaintiff in Florence was placed in a general prison population. The Court noted, “This case does not require the Court to rule on the types of searches that would be reasonable in instances where, for example, a detainee will be held without assignment to the general jail population and without substantial contact with other detainees.” Id. at 1522.
B
The officers do not dispute that the search violated Gonzalez’s right to be free from unreasonable searches; their position is that the right violated was not clearly established. We need not determine whether the facts alleged make out a violation of a constitutional right prior to determining whether that right was clearly established. See Pearson v. Callahan, 555 U.S. 223, 236, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009) (dispensing with the rule announced in Saucier v. Katz, 533 U.S. 194, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001), that required courts to first determine whether there was a constitutional violation. before proceeding to the qualified immunity analysis). This is especially true here, where the issue was not fully briefed by the government. Id. at 225, 129 S.Ct. 808 (cautioning that courts should not rule on constitutional, issues where “the briefing of constitutional questions is woefully inadequate”).
C
Defendants-Appellees are not liable under § 1983 unless the right at issue was clearly established, meaning that “[t]he contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right.” Anderson v. Creighton, 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d *161 523 (1987). “In deciding whether a right was clearly established, we ask: (1) Was the law defined with reasonable clarity? (2) Had the Supreme Court or the Second Circuit affirmed the rule? and (3) Would a reasonable defendant have understood from the existing law that the conduct was unlawful?” Young v. Cnty. of Fulton, 160 F.3d 899, 903 (2d Cir.1998). The answer to all three is no.
At the time of the search, we had never held that the Fourth Amendment is violated by a suspicionless search (strip search or visual body cavity search) of a person arrested for felony drug possession. Although we have repeatedly held that the police may not conduct a suspicionless strip or body cavity search of a person arrested for a misdemeanor, reasonable officers could disagree as to whether that rule applied to those arrested for felony drug crimes, given the propensity of drug dealers to conceal contraband in their body cavities. See, e.g., Mary Beth G. v. City of Chicago, 723 F.2d 1263, 1273 (7th Cir.1983) (describing “narcotics violations” as one of the “kinds of crimes, unlike traffic or other minor offenses, that might give rise to a reasonable belief that the. arrestee was concealing an item in a body cavity”). Judge McMahon (who seems to have had a full share of these cases) has repeatedly emphasized that we have never applied the rule from Weber and Shain to searches of suspects arrested for felony drug crimes. See Samicola v. Cnty. of Westchester, 229 F.Supp.2d 259, 270 (S.D.N.Y.2002); Murcia v. Cnty. of Orange, 226 F.Supp.2d 489, 494 (S.D.N.Y.2002).
The New York Court of Appeals’ decision in People v. Hall, 10 N.Y.3d 303, 856 N.Y.S.2d 540, 886 N.E.2d 162 (2008), does not support the view that the search of Gonzalez violated a clearly established federal' constitutional rule. Hall was decided after the search at issue in this case. It is not a ruling of the Supreme Court or this Court. And though the wording in Hall seems promising for Gonzalez — “[o]ur precedent on this point is unequivocal: the police are required to have ‘specific and articulable facts which, along with any logical deductions, reasonably prompted th[e] intrusion,’ ” id. at 311, 856 N.Y.S.2d 540, 886 N.E.2d 162 (emphasis added) (alteration in original) (quoting People v. Cantor, 36 N.Y.2d 106, 113, 365 N.Y.S.2d 509, 324 N.E.2d 872 (1975))—not one case cited in Hall said that an officer needs particular, individualized facts to conduct a visual body cavity search.[5]
Shain 'v. Ellison is similarly distinguishable: ' the arrest was for first degree harassment, a misdemeanor. 273 F.3d 56, 60 (2d Cir.2001). A reasonable officer who made á study of these ramified precedents could distinguish arrests for offenses such as harassment from arrests for felonies— especially felonies involving drugs. In any event, Shain is likely no longer good law in light of Florence v. Board of Chosen Freeholders of County of Burlington, — U.S. -, -, 132 S.Ct. 1510, 1515, 182 L.Ed.2d 566 (2012), which held that misdemeanor arrestees could be subject to visual body cavity searches before being placed in the general prison population, as the plaintiff in Shain was. Shain, 273 F.3d at 60,65-66.
While we can expect police officers to be familiar with black-letter law applicable to commonly encountered situations, they cannot be subjected to personal liability under § 1983 based on anything less. *162 There are so many permutations of fact that bear upon the constitutional issues of a search: the arrest can be for a misdemeanor or a felony, for a drug offense or not; the search can be a strip search, a visual body cavity search, or a manual one; the person arrested can be headed to the general prison population or a single cell; the place of the search can be private or less than private; the impetus for the search can be .a tip, or the policeman’s observations or experience or hunch, or the neighborhood, or a description, or some or all of the =above; and other considerations as well. The policeman is not expected to know all of our precedents or those of the Supreme Court, or to distinguish holding from dicta, or to put together precedents for line-drawing, or to discern trends or follow doctrinal trajectories. .Otherwise, qualified immunity would be available only to a cop who is a professor of criminal procedure in her spare time. The police cannot be expected to know such things at risk of personal liability for the policeman’s savings, home equity, and college funds. And such personal liability is the. only kind of liability imposed by § 1988 (absent a Monell claim). That tells us something about the threshold of liability in these cases.[6]
We conclude that a reasonable officer— even one familiar with the cases described above — would not have understood that conducting an otherwise suspicionless visual body cavity search of a person arrested for a felony drug offense was unlawful; the defendants in this case are therefore entitled to qualified immunity.[7]
IV
Gonzalez also claims malicious prosecution under § 1983. A § 1983 claim for malicious prosecution looks to the relevant state common law. See Janetka v. Dabe, 892 F.2d 187, 189 (2d Cir.1989). Under New York law, a plaintiff must show that the underlying proceeding was terminated in his favor to make out a malicious prosecution claim. See id. at 189. “Where the prosecution did not result in an acquittal, it is deemed to have ended in favor of the accused, for these purposes, only when its final disposition is such as to indicate the innocence of the accused.’’ ' Murphy v. Lynn, 118 F.3d 938, 948 (2d Cir.1997).
Here, the officers found crack cocaine in Gonzalez’s rectum, eliminating any doubt that Gonzalez was, in fact, guilty of at least criminal possession of a controlled substance. His malicious prosecution claim therefore fails.
CONCLUSION
For the foregoing reasons, the judgment of the district court dismissing all of Gon *163 zalez’s claims against the officers in their individual capacities is AFFIRMED.

. Gonzalez also alleged state law claims for negligent infliction of emotional distress, negligence, intentional infliction of emotional distress, malicious prosecution, and false imprisonment. He withdrew all of these except the malicious prosecution and false imprisonment claims before the district court decided the summary judgment motion.

. Gonzalez does not appeal the dismissal of the claims against the City and County.

. "[W]here ... an arresting officer has acted on the basis of a radio communication from a fellow officer who has personal knowledge of the facts transmitted, he or she presumptively possesses the requisite probable cause.” People v. Pacer, 203 A.D.2d 652, 653, 610 N.Y.S.2d 636 (3d Dep’t 1994).

. This conclusion also disposes of Gonzalez’s state law false imprisonment claim against the officers because "New York Law ... grant[s] government officials qualified immunity on state-law claims except where the officials’ actions are undertaken in bad faith or without a reasonable basis. Jones v. Parmley, 465 F.3d 46, 63 (2d Cir.2006); see also Blouin ex rel. Estate of Pouliot v. Spitzer, 356 F.3d 348, 364 (2d Cir.2004).

. Cantor, the case relied upon in Hall for this proposition, does not mention the words "strip search” or "body cavity search.” The rule in Hall was characterized as a "pronouncement” by the trial court in People v. Crespo, reflecting its novelty. 29 Misc.3d 1203(A), 2010 WL 3808691, at *8 (N.Y.Sup. Ct.2010).

. The premise — that a suit against an individual government employee is in substance a suit against his employer — is wrong. Doubtless in some political subdivisions of this Circuit the government supplies defense counsel and pays the judgment if an officer is person- , ally liable under § 1983. But this Circuit includes scores of counties and hundreds of towns and municipalities; and there are thousands of political subdivisions in the nation. Not all of them will indemnify their employees for § 1983 judgments; many cannot even afford to furnish a defense; some can barely keep the school open.

. Gonzalez also alleges that the defendants violated his Fourth Amendment rights when they conducted a manual body cavity search and pulled the bag of crack Cocaine out of Gonzalez’s anus. Who pulled the bag out is disputed, but even assuming it was the officers, they would not have violated clearly established law by doing so; once they saw the bag protruding from Gonzalez’s anus, they had probable cause to search him for it, and we have never held that such a search requires a warrant. Cf. Hall, 10 N.Y.3d at 310-11, 856 N.Y.S.2d 540, 886 N.E.2d 162.